IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

YOLANDA OSBORN,                    )
                                   )
                Plaintiff,         )
                                   )
        v.                         )      Case No.
                                   )      05-0587-CV-W-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,                )
                                   )
                Defendant.         )

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Yolanda Osborn seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Title
II of the Social Security Act ("the Act").  Plaintiff argues
that ALJ improperly analyzed the opinion of treating
physician Laura Alba, improperly substituting his own
opinion, and that the hypothetical did not accurately
capture plaintiff's impairments.  I find that the
substantial evidence in the record as a whole does not
support the ALJ's decision to discredit the opinion of Dr.
Alba and does support a finding that plaintiff was disabled
from August 31, 2002, through February 14, 2005.  Therefore,
plaintiff's motion for summary judgment will be granted and
the decision of the Commissioner will be reversed.

## I.   BACKGROUND

On February 28, 2003, plaintiff applied for disability benefits alleging that she had been disabled since August 31, 2002.  Plaintiff's disability stems from Crohn's disease and cancer.  Plaintiff's application was denied on April 18, 2003.  On January 11, 2005, a hearing was held before an Administrative Law Judge.  On February 14, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On May 13, 2005, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

While all of this was going on, plaintiff filed a subsequent application for disability benefits.  Plaintiff's application was granted on February 15, 2005 -- the day after the ALJ denied plaintiff's request for benefits in this case.  Therefore, the issue before me now is whether plaintiff is entitled to benefits from her alleged onset date through February 14, 2005.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the

2

Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 850-51 (8th Cir. 2000); <u>Johnson v. Chater</u>, 108 F.3d 178, 179 (8th Cir. 1997); <u>Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference

3

by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These

4

regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

    1.   Is the claimant performing substantial gainful
activity?

                Yes = not disabled.
                No = go to next step.

    2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits her
ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

    3.   Does the impairment meet or equal a listed
impairment in Appendix 1?

                Yes = disabled.
                No = go to next step.

    4.   Does the impairment prevent the claimant from
doing past relevant work?

                No = not disabled.
                Yes =  go to next step where burden shifts to
Commissioner.

    5.   Does the impairment prevent the claimant from
doing any other work?

                Yes = disabled.
                No = not disabled.

*IV.* *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Amy Salva, in addition to documentary evidence admitted at the hearing.

*A.* *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1964 through 2004:

| Year | Earnings | Indexed Earnings |
|------|---------|-------------------|
| 1964 | $    14.00 | $    101.73 |
| 1965 |      0.00 |       0.00 |
| 1966 |     61.07 |     411.21 |
| 1967 |  1,062.25 |   6,775.19 |
| 1968 |    145.00 |     865.36 |
| 1969 |  1,119.80 |   6,317.82 |
| 1970 |  3,119.30 |  16,766.77 |
| 1971 |  2,782.40 |  14,240.34 |
| 1972 |  3,989.30 |  18,594.94 |
| 1973 |  4,345.74 |  19,063.57 |
| 1974 |  2,756.68 |  11,414.28 |
| 1975 |  5,228.47 |  20,143.57 |
| 1976 |  5,333.99 |  19,223.63 |

6

| | | |
|---|---:|---:|
| 1977 | $ 6,062.01 | $20,612.07 |
| 1978 | 1,580.72 | 4,979.36 |
| 1979 | 0.00 | 0.00 |
| 1980 | 0.00 | 0.00 |
| 1981 | 6,629.23 | 16,004.80 |
| 1982 | 8,699.15 | 19,906.28 |
| 1983 | 7,623.51 | 16,634.53 |
| 1984 | 7,939.88 | 16,362.97 |
| 1985 | 8,812.44 | 17,419.04 |
| 1986 | 9,316.69 | 17,884.92 |
| 1987 | 10,160.71 | 18,335.80 |
| 1988 | 11,507.49 | 19,791.42 |
| 1989 | 11,103.10 | 18,368.63 |
| 1990 | 13,211.40 | 20,891.53 |
| 1991 | 13,398.95 | 20,426.89 |
| 1992 | 13,386.46 | 19,407.88 |
| 1993 | 12,283.83 | 17,657.41 |
| 1994 | 14,900.36 | 20,858.71 |
| 1995 | 15,471.81 | 20,823.97 |
| 1996 | 14,972.53 | 19,212.39 |
| 1997 | 15,342.94 | 18,602.23 |
| 1998 | 27,172.54 | 31,306.26 |
| 1999 | 26,567.16 | 28,993.05 |
| 2000 | 27,608.49 | 28,550.62 |
| 2001 | 10,308.33 | 10,411.71 |
| 2002 | 9,544.91 | 9,544.91 |

Case 4:05-cv-00587-REL   Document 23   Filed 08/28/06   Page 7 of 51

|      |    |      |    |      |
|------|----|------|----|------|
| 2003 | $  | 0.00 | $  | 0.00 |
| 2004 |    | 0.00 |    | 0.00 |

(Tr. at 82-84).

During the years of plaintiff's highest earnings, she held multiple jobs. In 1998, plaintiff worked for both the Kansas City Downtown Hotel Group and the Ritz-Carlton Hotel Company (Tr. at 86). During 1999, plaintiff worked at the Raphael Hotel, the Kansas City Downtown Hotel Group, the Ritz-Carlton Hotel Company, and Cracker Barrel Restaurant (Tr. at 86-87). During 2000, plaintiff worked at the Raphael Hotel and the Kansas City Downtown Hotel Group (Tr. at 87). During 2001 plaintiff worked at the Raphael, the Kansas City Downtown Hotel Group, Pacwest Foods, Houlihans Restaurant, and Expo Management (Tr. at 87-88).

**Work History Report**

In a Work History Report, plaintiff stated that her housekeeper job at the Raphael Hotel involved turning down beds and washing and drying towels, sheets, and pillow cases (Tr. at 108, 112). She was required to walk for five hours, stand for two hours, sit for two hours, kneel for five hours, and stoop for five hours (Tr. at 112).

8

**B.    *SUMMARY OF MEDICAL RECORDS***

Plaintiff's alleged onset date is August 31, 2002.

On October 22, 2002, plaintiff was seen at Truman Medical Center for a follow up on Crohn's disease and hypertension (Tr. at 236-237).  Plaintiff had been experiencing left sided abdominal pain, diarrhea, and blurry vision.  Plaintiff had been on Predinsone for 13 years. Most of this record is illegible; however I can read that the doctor prescribed Lisinopril for plaintiff's hypertension which was listed as uncontrolled and Prednisone[1] for her Crohn's disease.  Plaintiff was told to schedule an appointment at the GI [gastrointestinal] clinic.

On January 14, 2003, plaintiff had a screening mammography done at Truman Medical Center (Tr. at 235).

On January 16, 2003, Lee Steinberg, D.O., compared plaintiff's recent breast scans with previous scans, and determined that additional filming would be necessary (Tr. at 234).  Dr. Steinberg told plaintiff she would need another mammogram with spot compression imaging.

---

[1]Prednisone is a steroid. It reduces swelling and decreases the body's ability to fight infections.  One side effect is osteoporosis.

On January 30, 2003, plaintiff saw Owen Smith, M.D., after she was referred by Dr. Molly Lewandowski for management of her Crohn's disease (Tr. at 228-230). Plaintiff complained of diarrhea and abdominal pain. Plaintiff complained that her abdominal pain is present just about every day. "I certainly think that prednisone should be a last resort in this lady, and I recommend that she undergo colonoscopy to determine the severity of her disease and the extent of her disease. . . .  I would probably recommend that we start her on 6-mercaptopurine[2] and use Remicade[3] rather than relying on corticosteroids [or Prednisone]. . . .  I am not completely convinced yet that she really has inflammatory bowel disease.  On the other hand, if she has been treated on multiple occasions with corticosteroids and does have underlying inflammatory bowel disease, then osteoporosis[4] would be anticipated here to be a significant problem.  I have recommended that she also get a bone density scan."

---

[2]Interferes with the growth of cancer cells.

[3]Used to treat Crohn's disease by reducing inflammation.

[4]Osteoporosis is a disease in which bones become fragile and more likely to break.

10

On January 30, 2003, plaintiff had a mammogram of the left breast (Tr. at 231).

On February 6, 2003, plaintiff had a bone densitometry performed at Truman Medical Center (Tr. at 225). Her exam demonstrated osteopenia [low bone mineral density, but not quite low enough to be called osteoporosis].

On February 18, 2003, plaintiff had a colonoscopy and biopsy done at Truman Medical Center (Tr. at 222). Cecilia Rosales, M.D., examined plaintiff's stricture transverse colon after biopsy and diagnosed infectious colitis and quiescent inflammatory bowel disease (Tr. at 221).

On February 25, 2003, plaintiff was seen at Truman Medical Center for a sonogram of her left breast (Tr. at 217). The doctor found a small cluster of tiny calcifications and recommended a sterotactic biopsy.

On February 27, 2003, plaintiff was seen by Dr. O. Smith at Truman Medical Center for problems with Crohn's disease (Tr. at 212-213). Plaintiff complained of diarrhea and pain. The doctor restarted plaintiff's Prednisone, told plaintiff to see social services that day about an application for medicaid so plaintiff could get her prescriptions, told her have blood work done that day and to return in two weeks. The results of plaintiff's blood work

11

showed her alkaline phosphate was high at 143, and her AST
and ALT (liver enzymes) were both low (Tr. at 214).
Plaintiff's red blood count was low, her hemoglobin was low,
and her platelet count was high.  She had myriad other
abnormal measurements (Tr. at 215-217).

On March 6, 2003, plaintiff was seen at Truman Medical
Center for Crohn's disease (Tr. at 207-208).  She stated
that her diarrhea had subsided on 40 mg Prednisone for a
week and her abdominal pain had also decreased.  Plaintiff
was told to continue Prednisone 40 mg per day for 5 days,
then cut down by 5 mg increments per week.

On March 13, 2003, plaintiff saw Glenn Talboy, Jr.,
M.D., at Truman Medical Center for preoperative history and
physical (Tr. at 201-202).  Plaintiff reported to Dr. Talboy
that she has left abdominal pain when her Crohn's disease is
acting up.  She was taking 40 mg per day of Prednisone but
noted that she was scheduled to start a taper the following
week.

On April 2, 2003, plaintiff had an excisional biopsy of
a left breast lesion (Tr. at 193-196).

On April 28, 2003, plaintiff saw Glenn Talboy, M.D.,
for a left re-excision breast lumpectomy with sentinel lymph
node biopsy (Tr. at 170-171, 176-187).

On May 1, 2003, plaintiff was seen at Truman Medical Center for her Crohn's disease and a follow up on her hypertension (Tr. at 165-167). She was still taking Prednisone and was having no diarrhea. Plaintiff's blood pressure continued to be high (182/120). The doctor diagnosed uncontrolled hypertension and started plaintiff on Lisinopril.

On May 8, 2003, plaintiff was seen at the Diagnostic Breast Center (Tr. at 161). She described her pain as a four on a scale of one to ten. The doctor recommended she follow up in two weeks.

On May 9, 2003, plaintiff was seen by oncology at the Truman Medical Center (Tr. at 160).

On May 22, 2003, Matthew Callister, M.D., of the Cancer Institute saw plaintiff who had been newly diagnosed with carcinoma of the left breast (Tr. at 143-144). Dr. Callister's notes reflect that plaintiff experiences bouts of diarrhea due to her Crohn's disease. Dr. Callister explained radiation therapy versus mastectomy, recommended radiation, and plaintiff agreed to go forward with radiation.

On June 20, 2003, plaintiff was seen at Truman Medical Center for a follow up on her left breast cancer. The

13

doctor told plaintiff to schedule a breast clinic appointment as soon as possible regarding a lump in her right breast, and to schedule another clinic appointment, but the rest of that direction is illegible.

On July 2, 2003, plaintiff saw Laura Alba, M.D., a gastroenterologist at Truman Medical Center, for a follow up on Crohn's disease (Tr. at 153). Plaintiff's Prednisone was controlling her symptoms, but she had high blood pressure (183/110). Dr. Alba also noted a benign appearing stricture on plaintiff's last colonoscopy in February 2003. She indicating she planned to have plaintiff taper off her Prednisone.

On July 16, 2003, Matthew Callister, M.D., of the Cancer Institute, wrote a letter to plaintiff's attorney in lieu of completing forms for plaintiff's disability application (Tr. at 140-141). Dr. Callister's letter states in part as follows:

> I was unaware of Ms. Osborn's pursuit of claiming disability status. Rather than complete the forms, which were forwarded to me, I feel I can give you better information regarding her medical status through letter form.
>
> Ms. Osborn was referred to me from Truman Medical Center in May of 2003 for a very early stage breast cancer, which had been excised and found not to be

14

metastatic[5].  Based on the fact she was treated with a
lumpectomy surgically, breast irradiation was indicated
for which she was referred to me.  She has thus been
receiving radiation treatments to her breast in our
department beginning in early June and will finish in
approximately one week's time.  The side effects
associated with these treatments are mild to moderate
fatigue as well as moderate skin irritation, which is
temporary and usually resolves a few weeks after
completion of treatment.  Thus far, Ms. Osborn has
tolerated her treatments well and has mild skin
irritation as expected.  This skin irritation generally
limits patients temporarily from participating in
strenuous work activities, however, I expect her to
make a full recovery in the weeks following the
completion of treatment.

Of important note, a recent abnormality was palpated in
the other breast for which Ms. Osborn is currently
undergoing a diagnostic work up at Truman Hospital.  If
malignancy is found, then further treatments will be
indicated.  Should this work up be negative for
malignancy, her breast cancer treatments and side
effects of therapy will soon come to an end.

Ms. Osborn's medical record states that she has other
medical conditions such as Crohn's disease.  I do not
manage this aspect of her health and cannot comment on
whether or not this condition has impact on her
disability claim.

On July 24, 2003, plaintiff was seen at Truman Medical

Center for a follow up on her blood pressure (Tr. at 173-

174).  Her blood pressure, despite taking Lisinopril, was

---

[5]The spread of a disease process from one part of the
body to another.

151/89.  The plan was to add Thiazide[6] and return in one
month.

On August 4, 2003, plaintiff finished radiation
treatment for breast cancer in her left breast (Tr. at 135,
246).  Matthew Callister, M.D., of the Cancer Institute,
noted that a palpable abnormality was discovered in
plaintiff's right breast which was being worked up.

On August 20, 2003, plaintiff saw Dr. Alba for a follow
up on Crohn's disease (Tr. at 152).  Plaintiff's symptoms
had improved, she had no diarrhea, no blood in her stool, no
abdominal cramping.  Dr. Alba told plaintiff to begin
tapering off her Prednisone.

On September 17, 2003, plaintiff saw Susan Smith, M.D.,
in the Cancer Institute (Tr. at 245).  Plaintiff complained
of fatigue.  Dr. Smith continued plaintiff on Tamoxifen[7].

On December 1, 2003, Laura Alba, M.D., completed a
Physical Residual Functional Capacity Questionnaire (Tr. at
238-242).  Dr. Alba wrote that plaintiff has Crohn's
colitis, and her prognosis was fair if she adheres to

--------

[6]Hydrochlorothiazide is a thiazide diuretic (water
pill).  It decreases the amount of fluid in the body by
increasing the amount of salt and water lost in the urine.

[7]Tamoxifen blocks the actions of the hormone estrogen.
Certain types of breast cancer require estrogen to grow.

16

therapy and follow up.  She wrote that plaintiff experiences abdominal pain, fatigue, and bloody diarrhea.  Dr. Alba noted that plaintiff's pain ranges from mild to severe with exacerbation of her disease.  The clinical findings and objective signs were left lower abdominal tenderness and anemia.  Plaintiff's side effects from Prednisone include osteoporosis, cataracts, mood swings, fluid retention, and the rest are illegible.  Plaintiff's impairment was expected to last at least 12 months.

Dr. Alba wrote that plaintiff is not a malingerer.  Dr. Alba noted that when plaintiff is having episodes of exacerbation, her symptoms would "frequently" be severe enough to interfere with attention and concentration needed to perform simple work tasks.  The form asks "to what degree can your patient tolerate work stress", and Dr. Alba checked, "capable of low stress jobs", and she explained, "Patient's condition is chronic, but has periods of remission".

Dr. Alba found that plaintiff can walk about three blocks during periods of remission, can sit more than two hours at one time, can stand for 30 minutes at a time and can sit, stand and walk for at least six hours total during an eight-hour day.  She found that plaintiff will sometimes

17

need to take three to four unscheduled breaks during the day for ten to 15 minutes each to use the restroom. She found that plaintiff can occasionally lift less than ten pounds. She can frequently look down, turn her head, look up, and hold her head in a static position. She can occasionally twist, stoop, crouch, squat, and climb, and she has no limitations on reaching, handling, or fingering.

When asked whether plaintiff's impairments were likely to produce good days and bad days, Dr. Alba checked, "yes" and wrote "Patient will have months with no symptoms during remission but periods of disease activity may last for many days even weeks". Dr. Alba was asked whether the symptoms and limitations had been present since August 1, 2002, and Dr. Alba wrote that she first documented the disease in her clinic charts in October 2002, "but patient did prob[ably] have disease prior to that date."

On December 2, 2003, plaintiff was seen at Truman Medical Center for a follow up on her Crohn's disease (Tr. at 151, 337). Plaintiff had been having bloody stool and abdominal pain. Dr. Alba had started plaintiff on Prednisone and her symptoms improved. Dr. Alba planned to try to decreased plaintiff's dose of Prednisone and see her

back in four weeks.  She noted that plaintiff was due for a colonoscopy and a bone density test.

On December 30, 2003, plaintiff was seen by Dr. Alba at Truman Medical Center for a follow up on Crohn's disease (Tr. at 333).  She complained of an episode of diarrhea and abdominal pain.  Dr. Alba decreased plaintiff's Prednisone and directed her to have a complete blood count before the next month's follow up visit.

On January 12, 2004, plaintiff saw Dr. Callister, in the Radiation Oncology clinic at the Cancer Institute (Tr. at 244).  Dr. Callister noted that since plaintiff's last visit, she had been experiencing persistent musculoskeletal pain and was also experiencing fatigue. Dr. Callister continued plaintiff on Tamoxifen.

On January 28, 2004, plaintiff was seen at Truman Medical Center for a follow up on her Crohn's disease (Tr. at 325-327).  The doctor noted that plaintiff had been closely monitored because of her anemia.  She had been put on iron pills the month before but had to discontinue that medication due to diarrhea.  She was instructed to return in one month, and to have a complete blood count in one month.

On February 2, 2004, plaintiff had a mammography of the right breast (Tr. at 323-324).

19

On February 17, 2004, plaintiff was seen in the Diagnostic Breast Center at Truman Medical Center (Tr. at 321-322). She reported continued symptoms of Crohn's disease.

On March 1, 2004, plaintiff was seen at Truman Medical Center for a follow up on her Crohn's disease (Tr. at 318). Plaintiff continued to have abdominal pain and diarrhea. Most of this record is illegible.

On March 2, 2004, plaintiff had a thyroid ultrasound (Tr. at 317).

On March 17, 2004, plaintiff saw Dr. Talboy (Tr. at 314-315). Plaintiff reported that she was able to walk up a flight of stairs or one city block without shortness of breath or chest pain. She did report abdominal pain associated with Crohn's disease. Dr. Talboy planned a left thyroid lobectomy, and told plaintiff she would need to have preoperative labs, an EKG, and chest x-rays.

On March 26, 2004, plaintiff had chest x-rays taken, had her blood drawn, and also told her doctor she had stopped taking the iron prescription because it gave her diarrhea (Tr. at 310-313). She began taking multi-vitamins with iron instead.

On April 5, 2004, plaintiff was seen at Truman Medical Center for a follow up on her Crohn's disease (Tr. at 307). Plaintiff complained that she was still having diarrhea, the Lomotil[8] was ineffective. Dr. Alba noted that after plaintiff's thyroid surgery, she would schedule plaintiff for a colonoscopy and try a new medication (which is illegible) in an effort to get plaintiff off Prednisone.

On April 7, 2004, plaintiff underwent a left thyroid lobectomy (Tr. at 303-306). She was discharged the following day.

On April 9, 2004, plaintiff was seen at Truman Medical Center (Tr. at 290-291). She complained that when she was drinking, she felt like the liquid got caught in her throat and she began vomiting blood. Plaintiff's blood pressure was 207/132, pulse was 106. Plaintiff was given HCTZ [reduces fluid retention] and Lisinopril [an ACE inhibitor to lower blood pressure]. Her blood pressure came down to 178/113, and plaintiff was discharged and instructed to continue her medications.

On April 28, 2004, plaintiff was seen at Truman Medical Center for a pap smear (Tr. at 287-288). She complained of

---

[8]Lomotil provides relief from spasms of the gastrointestinal tract including the stomach and intestines.

fatigue and hoarseness after her thyroid surgery. The remainder of this record is illegible.

On May 4, 2004, plaintiff saw Glenn Talboy, Jr., M.D., who scheduled a right thyroid lobectomy for June 2, 2004 (Tr. at 285-286).

On June 2, 2004, plaintiff underwent a right thyroid completion lobectomy, and was discharged from the hospital the following day on Percocet in addition to her regular medications (Tr. at 280-284).

On June 8, 2004, plaintiff was seen for a follow up on her thyroidectomy (Tr. at 279). Plaintiff was having dysphagia [difficulty swallowing]. She was also having trouble speaking very loud and her voice was becoming "fatigued". The doctor told plaintiff to schedule an appointment with endocrinology and come back in one month for a follow up.

On June 14, 2004, plaintiff was seen at Truman Medical Center for a follow up on her Crohn's disease (Tr. at 275-276). Plaintiff complained of having diarrhea and said the Prednisone was not helping. She was also suffering from increased abdominal pain. Dr. Alba noted that when the Prednisone is decreased, plaintiff's symptoms worsen. Dr.

22

Alba increased plaintiff's Prednisone and scheduled a colonoscopy.

On June 23, 2004, plaintiff saw Glenn Talboy, Jr., M.D., for thyroid cancer (Tr. at 273-274). Plaintiff reported abdominal pain and diarrhea related to Crohn's disease. Dr. Talboy scheduled a right thyroid lobectomy.

On July 13, 2004, plaintiff underwent a colonoscopy performed by Christian Dang, M.D., for a follow-up on her Crohn's disease (Tr. at 267-270). Dr. Dang removed a polyp, then saw evidence of Crohn's disease 7 cm from the anal verge extending up to 8 cm where he saw a stricture. He was unable to pass the scope beyond the stricture. Dr. Dang recommended plaintiff begin taking Imuran[9], continue taking Prednisone, return in two weeks for results of the biopsy, and see Dr. Alba in two weeks at which time she may need to begin taking Remicade[10] and increase her Imuran.

On July 14, 2004, plaintiff saw Dr. Callister in the Radiation Oncology department at Baptist Lutheran Medical Center for a follow up on breast cancer (Tr. at 243). He

---

[9]An immunosuppressant.

[10]Used to treat Crohn's disease by reducing inflammation.

23

found no evidence of breast cancer recurrence. He continued her on Tamoxifen.

On July 22, 2004, plaintiff saw Lamonte Weide, M.D., Ph.D., in the endocrine department of Truman Medical Center (Tr. at 261-265). Plaintiff described her pain as an eight on a scale of one to ten. Plaintiff was taking Tamoxifen, Prednisone, Lisinopril, and Fosamax[11]. Dr. Weide assessed papillary thyroid carcinoma, hypothyroidism, hypertension, Crohn's disease, and adrenal insufficiency secondary to long-standing Prednisone use. Dr. Weide arranged treatment of the thyroid cancer including a whole-body scan, prescribed Levoxyl [thyroid hormone] after the whole-body scan, increased her Lisinopril [blood pressure medicine] and restarted her Hydrochlorothiazide [water pill], and warned that plaintiff should not go below 5 mg of Prednisone without an extremely slow taper due to her long-standing Prednisone use.

On July 27, 2004, plaintiff was seen at Truman Medical Center for a follow up on Crohn's post-colonoscopy (Tr. at 257-260). Plaintiff complained of bouts of diarrhea, the remainder of the complaints are illegible. Plaintiff rated

---

[11]A compound that alters the cycle of bone formation and breakdown in the body.

24

her pain a seven out of ten in severity. Plaintiff was on a variety of medications including Prednisone. Dr. Alba assessed Crohn's disease, moderate to severe activity. She stopped two of plaintiff's medications while she was being treated for thyroid cancer, and told plaintiff to take 20 mg of Prednisone per day and start taking Cipro [an antibiotic].

On July 27, 2004, plaintiff underwent a thyroidectomy [surgical removal all or part of the thyroid gland] (Tr. at 256).

On August 2, 2004, plaintiff was seen at Truman Medical Center for thyroid cancer therapy (Tr. at 255).

On August 6, 2004, plaintiff had a whole body scan in the radiology department at Truman Medical Center (Tr. at 254). The scan showed increased intense uptake[12] within the thyroid, likely residual tissue given plaintiff's history of thyroid surgery for papillary thyroid cancer.

On August 17, 2004, plaintiff was seen at Truman Medical Center for a follow up on her thyroidectomy (Tr. at 253). The doctor noted that plaintiff needed an appointment in endocrine for a whole body scan, increased uptake in the

---

[12]The absorption by a tissue of some substance (in this case, iodine used in the scan).

lymph node, may need more radiation.  The doctor started
plaintiff on Levoxyl [thyroid hormone].

On August 31, 2004, plaintiff had a bilateral
mammography at Truman Medical Center with benign findings of
the right breast and postoperative changes in the left
breast (Tr. at 252).

On September 1, 2004, plaintiff saw Dr. Alba for a
follow up on her Crohn's disease (Tr. at 248-251).
Plaintiff complained of abdominal cramping. Dr. Alba noted
severe inflammation on plaintiff's endoscopy.  Dr. Alba
wrote something about status post surgical resection and
radiation treatment, but the rest of that sentence is
illegible.  Plaintiff was prescribed Darvocet [a narcotic
analgesic], Asacol[13], Imuran [immunosuppressant], and
decreased her Prednisone to 15 mg.  She told plaintiff to
finish six weeks of Cipro [antibiotic].

On September 23, 2004, Laura Alba, M.D., completed a
Crohn's & Colitis Residual Functional Capacity Questionnaire
(Tr. at 122-126).  Dr. Alba stated that plaintiff's
prognosis was "fair to guarded", and that her symptoms

_____

[13]The exact way this drug works is unknown, but it is
believed to reduce the actions of a substance in the body
that causes inflammation, tissue damage, and diarrhea.

included chronic diarrhea, abdominal pain and cramping, abdominal distention, malaise, and fatigue. In describing plaintiff's pain, Dr. Alba wrote, "[illegible] and RLQ [right lower quadrant] pain, intermittent, moderate intensity". She wrote, "Patient is steroid dependent. Episodes present 2-3 [illegible] last for a few days up to 1-2 week moderate intensity". The clinical signs and objective findings included weight loss, anemia, abdominal tenderness, and a colonoscopy which showed severe colitis with colonic stricture. The effects of plaintiff's medications included nausea, vomiting, osteoporosis, electrolite imbalance, glucose intolerance, increased blood pressure, and mood swings, in addition to several other illegible effects. She noted that plaintiff's pain or other symptoms are severe enough to interfere with attention and concentration frequently. Dr. Alba stated that the impairments have or are expected to last at least 12 months, and plaintiff is not a malingerer.

Dr. Alba found that plaintiff can walk one to two blocks without rest, she can sit for 45 minutes at one time, she can stand for 30 minutes at one time, she can stand or walk for about two hours total per day, she would need to change from sitting to standing to walking at will, and she

needs ready access to a restroom.  Dr. Alba stated that plaintiff would need to take unscheduled restroom breaks about two to three times per day during exacerbation periods.  She said that plaintiff would occasionally need to lie down for 15 to 20 minutes on average.  She found that plaintiff can occasionally lift less than 10 pounds; occasionally twist, stoop, or bend; she can rarely crouch or climb ladders or stairs.  She found that plaintiff's impairments produce "good days" and "bad days" and that on average plaintiff would be likely to miss work from her impairments or treatment about three days per month.

*C.    SUMMARY OF TESTIMONY*

During the January 11, 2005, hearing, plaintiff testified; and Amy Salva, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff testified that she was 56 years old at the time of the hearing and is currently 58 years old (Tr. at 21).  Plaintiff has a tenth grade education (Tr. at 35).  She is 5' 2" tall and weighs 150 pounds (Tr. at 21).  Plaintiff has gained about 30 pounds due to her medications (Tr. at 21). She has been taking Prednisone since she was 41 years old (Tr. at 22).

28

Plaintiff suffers from Crohn's disease and has diarrhea even from so much as sneezing (Tr. at 22). The Prednisone is the only thing that has helped with her symptoms, but her doctor has been trying to get her off Prednisone since she has been on it so long (Tr. at 22-23). Plaintiff's symptoms have worsened over the years and her colon now stays inflamed (Tr. at 23-24). She now has to wear Depends for her accidents which are embarrassing (Tr. at 40). Properly taking her Prednisone, she does not have accidents (Tr. at 42, 47). But her doctor has been trying to reduce her dose because it is bad to be on Prednisone long term, and as her dose is decreased, plaintiff has accidents with diarrhea (Tr. at 42). Plaintiff's doctor is trying to get plaintiff in to see a doctor at Washington University in St. Louis who specialized in Crohn's disease (Tr. at 43).

Plaintiff's doctor has struggled with plaintiff's Crohn's medications because of plaintiff's cancer (Tr. at 43). Some of the Crohn's medications interfere with the medication plaintiff is on for her cancer treatments (Tr. at 44). When plaintiff has diarrhea, she sometimes does not have enough warning to get to the bathroom before she has an accident (Tr. at 45). Plaintiff estimated that in a 30-day

29

period, she would have six incidents of uncontrollable diarrhea (Tr. at 45-46).

Plaintiff suffers from abdominal pain due to the inflammation in her colon (Tr. at 47). It is like a very severe menstrual cramp (Tr. at 48). Plaintiff has to sleep on her side due to her abdominal pain (Tr. at 48).

Plaintiff believes she cannot work due to the symptoms of Crohn's disease and because she would have to miss so much work going to her doctor appointments (Tr. at 25).

Plaintiff has had a lumpectomy and ten to 12 weeks of radiation for breast cancer in 2003, and she had two surgeries for thyroid cancer in 2004 (Tr. at 27-28).

Plaintiff believes she could comfortably stand for an hour before needing to sit down (Tr. at 29). She has no problems with sitting (Tr. at 29). She estimated the heaviest weight she could carry for about 15 feet would be 20 to 25 pounds (Tr. at 29).

Plaintiff spends about four hours per day in bed because she is very tired, very fatigued (Tr. at 29, 31). Plaintiff can wash some dishes, do some cooking, and straighten up the house a little (Tr. at 31). Plaintiff's sister does her laundry for her (Tr. at 31-32). Plaintiff does no yard work, gardening, mopping, dusting, or vacuuming

30

(Tr. at 37). She can sweep with a broom (Tr. at 37).
Plaintiff walks about a half a block to the bus stop where
she catches a bus to take to her doctor appointments (Tr. at
32). She has a friend take her to church, and a friends
shops for groceries for her (Tr. at 36). Plaintiff lives
with her father who is almost 82, but she does not care for
him at all (Tr. at 36-37). Her 26-year-old son also lives
with her and her father (Tr. at 37). Plaintiff has a
medical card, and she receives $149 per month in food stamps
(Tr. at 37).

Plaintiff last worked in 2002 at Tona Roma's Restaurant
in Washington State (Tr. at 32-33). She cleaned, sectioned,
cooked, and refrigerated ribs (Tr. at 32). The job required
frequent heavy lifting (Tr. at 33). From 1998 to 2000,
plaintiff worked at the Marriott in downtown Kansas City as
a prep cook making salads and breakfast food (Tr. at 33-34).
Plaintiff could not do that job now because it requires
lifting salad bowls that weigh 75 to 100 pounds (Tr. at 34).
In 1999, plaintiff worked at the Raphael as a turn-down
person where she would turn down the bed covers and put
candy on the pillow (Tr. at 35). Plaintiff testified that
she probably could do that job now, but she has gone to all
of her previous employers and none of them are hiring (Tr.

31

at 35).  When asked whether she could perform that job full time, plaintiff said she could not due to her fatigue and all of her doctor appointments (Tr. at 49).

## 2.  Vocational expert testimony.

Vocational expert Amy Salva testified at the request of the Administrative Law Judge.  The vocational expert testified that plaintiff's past relevant work consists of a housekeeping job (the turn-down job) which is light, unskilled; the prep cook job which is medium level, semi-skilled but performed at the heavy to very-heavy level; and the cook position which is medium, skilled and was performed at the very-heavy level (Tr. at 51).

The ALJ then posed the following hypothetical:  A person with long-standing Crohn's disease treated by medications including Prednisone, and who one day per month would have problems due to tapering of Prednisone, who is status post lumpectomy followed by successful radiation treatment, who is followed for that on a six-month basis, who could stand at two-hour intervals for six to seven hours per day, no limitations on sitting, could lift 20 pounds occasionally and ten pounds frequently, could use her hands without difficulty, and can walk without difficulty (Tr. at 52-53).  The vocational expert stated, "I think she could

32

continue with the turn down position and the housekeeping position" (Tr. at 53).

The second hypothetical included the first but with the following changes:  The person needs to lie down for two to three hours per day in various intervals (Tr. at 53-54). The vocational expert testified that such a person could not be gainfully employed (Tr. at 54).

The third hypothetical also included the first, but the period of diarrhea with the tapering of medication occurred not one time a month but four to five days per month which would result in the person missing work on those days (Tr. at 54).  The vocational expert testified that the person would not be able to perform any work (Tr. at 54).

The vocational expert testified that if a person misses more than one day per month from sickness, the person could not maintain employment (Tr. at 54).  A normal employee receives 30 to 60 minutes for lunch and 15-minute breaks in the morning and afternoon (Tr. at 55).  If the person needs to be away from the work station more often than that on a regular basis, the person would have difficulty maintaining employment (Tr. at 55).

Finally, the vocational expert testified that if a person's inability to concentrate prevented her from staying

33

on task a third of the day, she would have difficulty maintaining employment (Tr. at 55).

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge Gary Lowe entered his opinion on February 14, 2005 (Tr. at 11-16).  The ALJ found at step one of the sequential analysis that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 11).  Plaintiff has a severe impairment from "status post breast and thyroid cancer with subsequent treatment and no recurrence and has Crohn's disease." (Tr. at 11).  Plaintiff's severe impairment does not meet or equal a listed impairment (Tr. at 12).

Before proceeding to step four of the sequential analysis, the ALJ determined that the opinion of treating physician Laura Alba, M.D., was not credible (Tr. at 13-14). He then found that plaintiff retains the residual functional capacity to stand for two hours at a time for a total of six to seven hours per day, sit without limitation, occasionally lift up to 20 pounds and frequently lift up to ten pounds, no limitation on the use of her hands, and retains the ability to walk to a bus stop (Tr. at 14-15).  Based on that residual functional capacity and the testimony of the vocational expert, the ALJ found that plaintiff could return

34

to her past relevant work as a housekeeper/"turn down person" (Tr. at 15). Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  *OPINION OF DR. ALBA*

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Alba.

The ALJ had this to say about Dr. Alba:

> [T]here are several residual functional capacity assessments from one of claimant's treating physicians, Laura Alba, M.D., which, if considered entirely credible, would be consistent with disability.  A review of these assessments indicates that Dr. Alba has somewhat changed her opinions at different times with regard to claimant's residual functional capacity.  For example, there is an assessment dated on September 23, 2004 which shows that claimant has had many diarrhea exacerbations and that her symptoms would frequently interfere with her ability to concentrate.  An earlier assessment from Dr. Alba dated December 1, 2003 and identified in the record at Exhibit 4F is characterized different[ly].  For example, in December 2003 claimant had the same pathology but it was noted at that time at number 7 of the RFC assessment that claimant responded well to therapy and only when she had an episode or exacerbation of her Crohn's would she have frequent attention and concentration deficits.  Claimant was thought capable of performing low stress jobs and it was noted that her Crohn's disease had periods of remission.  In the most recent assessment in September 2004 claimant was thought to be incapable of low stress jobs and was thought to need unscheduled rest room breaks two to three times a day during periods of exacerbation for about 15 minutes each.  She was also thought to need to occasionally lie down for up to 15 to 20 minutes to relieve her symptoms and had an expectation of missing about three days per month due to her problems.

35

. . . [A] review of claimant's outpatient treatment
records during the timeframe pertinent to this appeal
is inconsistent with claimant's current hearing
testimony and Dr. Alba's opinion.  There is no evidence
to support the degree of severity beginning in August
2002.  There is an outpatient treatment report dated
March 2003 . . . which notes that claimant does have
Crohn's disease but that her diarrhea had subsided on
Prednisone therapy.  The assessment was that her
Crohn's disease was in remission.  This is inconsistent
with a report dated in May 2003 from the cancer
institute . . . .  A review of claimant's systems
[sic] in May 2003 is inconsistent with her current
testimony.  For example, the gastrointestinal review
showed that claimant had been significant for
occasional bouts of diarrhea every one or two months
associated with her Crohn's disease.  Occasional bouts
of diarrhea every one or two months is inconsistent
with claimant's allegations of frequent exacerbations
everyday [sic].  An outpatient report dated May 1,
2003, from Truman Medical Center showed her Crohn's
disease to be in remission.  In July 2003 claimant's
Crohn's symptoms were noted to be well controlled on
Prednisone.  In December 2003 claimant was noted to be
doing fine with only one episode of diarrhea and
abdominal pain.  In January 2004 claimant was again
evaluated and at that time she denied any abdominal
pain or diarrhea.  In March 2004 claimant reported good
exercise tolerance with no complaints of any diarrhea
but she did report abdominal pain related to her
Crohn's disease on an intermittent basis.  An
outpatient report in April 2004 showed no complaints of
diarrhea.  A June 2004 report showed that claimant was
positive for diarrhea and was having two bowel
movements per day.  On June 23, 2004 claimant did
report occasional abdominal pain and diarrhea related
to her Crohn's disease but none at that time.  No
diarrhea was noted by claimant in July 2004 when she
was seen on July 22.  On July 22, 2004 claimant denied
any diarrhea.  Most recently in September 2004
claimant's symptoms secondary to her Crohn's disease
were noted to neither have improved or worsened and her
diarrhea was noted to be intermittent. . . .  It
appears rather that her physician has supported her
subjective complaints but a review of her treating

36

physician's outpatient treatment reports as noted above
belies the frequency, duration and severity alleged.

(Tr. at 13-14) (citations to the record omitted).

A treating physician's opinion is granted controlling
weight when the opinion is not inconsistent with other
substantial evidence in the record and the opinion is well
supported by medically acceptable clinical and laboratory
diagnostic techniques. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920
(8th Cir. 2005); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th
Cir. 2005). If the ALJ fails to give controlling weight to
the opinion of the treating physician, then the ALJ must
consider several factors to determine how much weight to
give to the opinion of the treating physician: (1) the
length of the treatment relationship, (2) frequency of
examinations, (3) nature and extent of the treatment
relationship, (4) supportability by medical signs and
laboratory findings, (5) consistency of the opinion with the
record as a whole, and (6) specialization of the doctor. 20
C.F.R. § 404.1527(d)(2) - (5).

In this case, the ALJ discussed only the consistency of
the opinion with the record as a whole in discrediting the
opinion of Dr. Alba. However, a closer look at the evidence

37

relied upon by the ALJ reveals that those medical records do not support the ALJ's finding.

1.   "An outpatient report dated May 1, 2003 from Truman Medical Center showed her Crohn's disease to be in remission." (Tr. at 14). On May 1, 2003, plaintiff was seen at Truman Medical Center, and Dr. Lewandowski found that plaintiff's hypertension was not controlled, and that her Crohn's disease was "not controlled" (Tr. at 166).

2.   "In July 2003 claimant's Crohn's symptoms were noted to be well controlled on Prednisone." (Tr. at 14). On July 2, 2003, plaintiff saw Dr. Alba who noted that the Prednisone was controlling plaintiff's symptoms, but she had to begin to taper off the Prednisone because the drug has dangerous side effects (Tr. at 153). Dr. Alba also noted that plaintiff's colonoscopy showed that she had a stricture in her colon, clearly abnormal. In addition, the record reflects that plaintiff had eight doctor appointments during the month of July 2003.

3.   "In December 2003 claimant was noted to be doing fine with only one episode of diarrhea and abdominal pain." (Tr. at 14). Plaintiff was seen by Dr. Alba twice during December 2003, and both times she complained of diarrhea and

38

abdominal pain despite taking Prednisone (Tr. at 151, 33, 337).

4.    "In January 2004 claimant was again evaluated and at that time she denied any abdominal pain or diarrhea." (Tr. at 14).  This portion of the record relied upon by the ALJ is the nurse's notes of plaintiff's symptoms (Tr. at 326).  In addition, the notes state that plaintiff denied diarrhea, but then states that plaintiff had to discontinue her anemia medication "due to diarrhea."  That visit was January 28, 2004.  Just two weeks before that, plaintiff's records show that she was taking 50 mg of Prednisone per day, which was a very high dose compared to when Dr. Alba tried to taper her doses to prevent any more bone damage (Tr. at 330).

5.    "In March 2004 claimant reported good exercise tolerance with no complaints of any diarrhea but she did report abdominal pain related to her Crohn's disease on an intermittent basis." (Tr. at 14).  First, I note that the ALJ completely skipped over February 2004.  On February 17, 2004, plaintiff reported continued symptoms of Crohn's disease (Tr. at 321-322).  On March 1, 2004, plaintiff was seen at Truman Medical Center and complained that she continued to have abdominal pain and diarrhea (Tr. at 318).

The record relied upon by the ALJ was a visit on March 17, 2004, to plaintiff's thyroid doctor (Tr. at 314-315). Dr. Talboy was concerned about plaintiff's chest pain and shortness of breath in relation to an upcoming left thyroid lobectomy, and the "good exercise tolerance" referred to by the ALJ was simply plaintiff's ability to walk up one flight of stairs or walk one city block without experiencing chest pain or shortness of breath. This examination was related to plaintiff's thyroid, not her Crohn's disease, although plaintiff did report that she experiences abdominal pain due to Crohn's. There is no place in this record where the doctor questioned plaintiff about her diarrhea or any other symptoms of Crohn's disease, hypertension, or breast cancer, all of which she was experiencing at that time.

6.  "An outpatient report in April 2004 showed no complaints of diarrhea." (Tr. at 14). The report to which the ALJ refers is from when plaintiff went to the Green Clinic the day after she was discharged from the hospital after having a thyroidectomy (Tr. at 290). She complained that when she swallowed, she felt like the liquid got stuck in her throat and she began to vomit. Her blood pressure was 207/132. There is no mention of diarrhea or lack of diarrhea on this medical form. The remainder of April 2004,

however, contains evidence that plaintiff continued to experience symptoms of Crohn's disease. On April 5, 2004, plaintiff was seen at Truman Medical Center for a follow up on her Crohn's disease (Tr. at 307). Plaintiff complained that she was still having diarrhea and that the Lomotil was ineffective. Dr. Alba noted that after plaintiff's thyroid surgery, she would schedule plaintiff for a colonoscopy and try another new medication in an effort to get plaintiff off Prednisone.

7. "A June 2004 report showed that claimant was positive for diarrhea and was having two bowel movements per day. On June 23, 2004 claimant did report occasional abdominal pain and diarrhea related to her Crohn's disease but none at that time." (Tr. at 14). This evidence, cited by the ALJ, actually supports Dr. Alba's opinion. The June 23, 2004, report cited by the ALJ was actually a follow up on thyroid cancer which had nothing to do with plaintiff's Crohn's although she did mention that she experiences abdominal pain and diarrhea (Tr. at 273).

8. "No diarrhea was noted by claimant in July 2004 when she was seen on July 22. On July 22, 2004 claimant denied any diarrhea." (Tr. at 14). Although plaintiff was seen in July 2004 for Crohn's the ALJ ignored those records

41

and instead cited the time when plaintiff was seen for her thyroid cancer (Tr. at 261-265). On July 22, 2004, plaintiff saw Lamonte Weide, M.D., Ph.D., in the endocrine department of Truman Medical Center. She described her pain as an eight on a scale of one to ten. Dr. Weide assessed papillary thyroid carcinoma and adrenal insufficiency secondary to long-standing Prednisone use. Dr. Weide arranged treatment of the thyroid cancer and warned that plaintiff should not go below 5 mg of Prednisone without an extremely slow taper due to her long-standing Prednisone use.

In addition to that July 2004 record cited by the ALJ, July 2004 also had plaintiff undergoing a colonoscopy performed by Christian Dang, M.D., who removed a polyp, then saw evidence of Crohn's disease 7 cm from the anal verge extending up to 8 cm where he saw a stricture (Tr. at 267-270). He was unable to pass the scope beyond the stricture.

In addition, on July 27, 2004, plaintiff was seen at Truman Medical Center for a follow up on Crohn's (Tr. at 257-260). Plaintiff complained of bouts of diarrhea, and she rated her pain a seven out of ten in severity. Dr. Alba assessed Crohn's disease, moderate to severe activity. She stopped two of plaintiff's medications while she was being

42

treated for thyroid cancer, and told plaintiff to take 20 mg
of Prednisone per day and start taking Cipro.

Clearly, the ALJ's finding that no diarrhea was noted
by plaintiff in July 2004 is not accurate.

9.  "Most recently in September 2004 claimant's
symptoms secondary to her Crohn's disease were noted to
neither have improved or worsened and her diarrhea was noted
to be intermittent." (Tr. at 14).  Again, the ALJ cited to
the notes of plaintiff's complaints wherein it was written,
"symptoms have not improved but have not worsen[ed].
Occasional abdominal pain and intermittent diarrhea." (Tr.
at 251).  The record also establishes that plaintiff was
suffering from abdominal cramping, and her symptoms were
chronic.  Dr. Alba noted severe inflammation on plaintiff's
endoscopy.

Based on a close look at the evidence relied on by the
ALJ, it is clear that the record as a whole is NOT
inconsistent with the opinion of Dr. Alba in either of her
residual functional capacity assessments.  Plaintiff's
symptoms of abdominal cramping and diarrhea were consistent
throughout the time frame at issue here.

The ALJ also discredited Dr. Alba's September 23, 2004,
opinion because, according to the ALJ, it differed from Dr.

43

Alba's opinion dated December 1, 2003. A closer look at
both of those residual functional capacity assessments shows
they are consistent and not contradictory.

The ALJ stated that "in December 2003 claimant had the
same pathology but it was noted at that time at number 7 of
the RFC assessment that claimant responded well to therapy
and only when she had an episode or exacerbation of her
Crohn's would she have frequent attention and concentration
deficits." Number seven of the RFC assessment reads as
follows:

> Describe the treatment and response including any side
> effects of medication that may have implications for
> working, e.g., drowsiness, dizziness, nausea, etc.:
> _Patient responds well to therapy. Side effects may include (Prednisone)_
> _osteoporosis, [illegible], cataracts, mood swings, fluid retention._

(Tr. at 238).

There is nothing in this response that establishes that
plaintiff's frequent attention and concentration deficits
would occur "only when she had an episode or exacerbation of
her Crohn's".

The ALJ also stated that "Claimant was thought capable
of performing low stress jobs" (Tr. at 13). However, the
question was:

44

To what degree can your patient tolerate work stress?

☐ Incapable of even "low stress" jobs     ■ Capable of low stress jobs

☐ Moderate stress is okay     ☐ Capable of high stress work

Dr. Alba wrote that plaintiff was capable of low stress jobs during periods of remission, but that she would still need to take three to four unscheduled breaks per day for ten to 15 minutes each (Tr. at 239, 240). She also noted that periods of disease activity may last for days and even weeks (Tr. at 241).

Clearly this residual functional capacity does not support a finding that plaintiff is capable of engaging in substantial gainful activity. The vocational expert testified that a person who needs to take any breaks other than a scheduled 15-minute morning break, a scheduled 15-minute afternoon break, and a scheduled 30-60 minute lunch break would have difficulty maintaining employment. Dr. Alba's finding that plaintiff would need three to four unscheduled breaks per work day clearly indicates that, according to her residual functional capacity assessment dated December 1, 2003, plaintiff was not capable of engaging in substantial gainful activity.

45

Her opinion dated September 23, 2004, likewise establishes that plaintiff was incapable of engaging in substantial gainful activity, and the ALJ admitted as much: "[T]here are several residual functional capacity assessments from one of claimant's treating physicians, Laura Alba, M.D., which, if considered entirely credible, would be consistent with disability." Dr. Alba found that plaintiff suffers from chronic diarrhea, abdominal cramping, fatigue, malaise, and abdominal distention. As discussed at length above, the record is replete with complaints and findings of these symptoms and an effort by plaintiff's physicians to control these symptoms without causing severe side effects from Prednisone and without interfering with plaintiff's treatment for breast cancer and thyroid cancer. Dr. Alba found that plaintiff's symptoms are frequently severe enough to interfere with her attention and concentration, which is consistent with plaintiff's testimony and the medical records which show consistent and regular complaints of diarrhea and abdominal cramping. Finally, Dr. Alba estimated that plaintiff would need to be absent from work about three days per month due to her symptoms, and the vocational expert testified that a person

46

who would need to miss more than one day of work per month could not be employed.

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's decision to discredit the opinion of treating physician Laura Alba, M.D. Therefore, plaintiff's motion for summary judgment on this basis will be granted.

## VII. HYPOTHETICAL

Plaintiff also argued that the hypothetical relied upon by the ALJ did not encompass all of plaintiff's impairments. This argument is not relevant given my finding above. However, I believe it is important to mention the vocational expert's testimony regarding plaintiff's attendance, given the unusual circumstances of this case.

In this case, the issue is merely whether plaintiff was disabled from August 31, 2002, through February 14, 2005 -- a finite number of days. The vocational expert testified that if a person missed more than one day of work per month, that person would not be able to engage in substantial gainful activity. During the relevant time period, plaintiff went to the doctor 53 times as outlined above (only one time was at her own initiative, when she went to

47

the Green Clinic for vomiting and severe high blood pressure
the day after she was released from the hospital).  All
other appointments were scheduled by her doctors.  In
addition, plaintiff also had the following appointments:

- February 20, 2003, was seen in radiology to check heart
  and to check for signs of active tuberculosis (Tr. at
  220).

- January 30, 2003, GI nursing assessment (Tr. at 211).

- March 21, 2003, for pre-op scheduling (Tr. at 200).

- March 31, 2003, for pre-op cardiac examination (Tr. at
  199).

- April 10, 2003, for breast cancer check (Tr. at 189A).

- April 26, 2003, for recheck on left breast lumpectomy
  (Tr. at 175).

- April 26, 2003, for left breast post-op exam (Tr. at
  175).

- May 21, 2003, for clinical assessment at the Cancer
  Institute (Tr. at 147-149).

- May 28, 2003, follow up for breast cancer (Tr. at 139,
  142).

- June 6, 2003, follow up for breast cancer and
  complained of fatigue (Tr. at 139).

- June 9, 2003, follow up for breast cancer (Tr. at 139).

- June 16, 2003, follow up for breast cancer (Tr. at 138,
  139).

- June 23, 2003, follow up for breast cancer (Tr. at
  138).

48

- June 30, 2003, follow up for breast cancer (Tr. at 137, 138).

- July 3, 2003, follow up for breast cancer (Tr. at 142).

- July 8, 2003, follow up for breast cancer (Tr. at 137).

- July 14, 2003, follow up for breast cancer (Tr. at 136).

- July 22, 2003, follow up for breast cancer (Tr. at 136).

- July 29, 2003, follow up on breast cancer (Tr. at 136).

- March 16, 2004, exam re: thyroid nodule (Tr. at 316).

Again, none of these medical visits were initiated by plaintiff -- all were follow ups that were scheduled by her treating physicians. This means that plaintiff would have been absent from work more than 72 times during the relevant time (I say more than 72 because several of these doctor visits were actually procedures which required plaintiff's hospitalization for more than one day). Missing work more than 72 times during a 30-month period is excessive according to the vocational expert's testimony. Additionally, this does not account for the days of work plaintiff would miss due to severe diarrhea and other symptoms, it only accounts for the work she would have missed while being treated for her breast cancer, thyroid cancer, hypertension, and Crohn's disease.

49

In most cases, it cannot be said that a person is disabled due to doctor appointments, for a person would be able to go to the doctor more than once a month and establish an inability to work. However, in this case, plaintiff's doctor appointments were scheduled by her treating physicians, not by her; and plaintiff's doctor appointments occurred during a finite number of days and would not establish a disability beyond the time described in the medical records above.

This clear evidence of excessive absence is just more support for a finding that plaintiff was disabled from August 31, 2002, through February 14, 2005.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's decision to discredit the opinion of Laura Alba, M.D., and that the substantial evidence in the record as a whole supports a finding that plaintiff was disabled from August 31, 2002, through February 14, 2005. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is

reversed and this case is remanded for an award of benefits.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 28, 2006